```
              IN THE UNITED STATES DISTRICT COURT
               FOR THE SOUTHERN DISTRICT OF OHIO
                        EASTERN DIVISION
```

Bobbi Rose,                      :

    Plaintiff,                :

  v.                             :      Case No. 2:12-cv-0354

Commissioner of Social           :      JUDGE EDMUND A. SARGUS, JR.
   Security,                            Magistrate Judge Kemp
                              :
    Defendant.

## REPORT AND RECOMMENDATION

### I.  Introduction

Plaintiff, Bobbi Rose, the widow of Edward Eugene Rose, filed this action seeking review of a decision of the Commissioner of Social Security denying Mr. Rose's application for supplemental security income.  That application was filed on April 9, 2008, and alleged that Mr. Rose became disabled on March 1, 2008.  Because Mr. Rose is no longer a party to the case, but he is the one who originally filed the claim for benefits, he will be referred to in this Report and Recommendation as "claimant."

After initial administrative denials of his application, Mr. Rose was given a hearing before an Administrative Law Judge on December 2, 2010.  In a decision dated January 5, 2011, the ALJ denied benefits.  That became the Commissioner's final decision on March 5, 2012, when the Appeals Council denied review.

After Mr. Rose filed this case, the Commissioner filed the administrative record on July 19, 2012.  Plaintiff was then substituted as a party because Mr. Rose had passed away. Plaintiff filed her statement of specific errors on September 12, 2012.  The Commissioner filed a response on December 14, 2012. No reply brief has been filed, and the case is now ready to

decide.

    II.  <u>Claimant's Testimony at the Administrative Hearing</u>

Claimant, who was 48 years old at the time of the administrative hearing and who has a tenth grade education, testified as follows.  His testimony appears at pages 16-37 of the administrative record.

Claimant could not recall when he last worked.  The last job or jobs he held involved picking up trash or doing security-type work at a horse stable.  He denied any recent work as a horse trainer despite the fact that such information appeared in some medical records.  He also denied recent illegal drug use although, again, evidence of such use appeared in medical records.

In response to questions from his attorney, claimant stated that he could not read or write.  He could also not count change.  He had worked as a tow truck driver in the late 1990s, but never mastered the paperwork requirements for that job.  He had five knee surgeries and his knee condition made it hard for him to walk even short distances.  He could not stand for more than three or four minutes at a time.  His knees gave out and he collapsed several times a week.

Claimant also testified to wrist problems.  He broke his left wrist in a fall and has had multiple surgeries on it, with hardware insertion and fusion.  He also broke his foot in a fall and needed surgery to repair it.  Additionally, he experienced ongoing pain from an old neck injury which caused migraine headaches and pain in his right arm.  He could not pick up small objects with his right hand.  Also, he had constant back pain which affected his ability to sit for more than a few minutes.

From a psychological standpoint, claimant testified that he heard voices daily and also had issues with anger.  Medication did not help.  He also had a poor memory and found it difficult

to be around other people.

    Finally, claimant testified that he slept poorly and left his home about once a week. He did no housework and attempted to rest during the day. He would alternate positions frequently during the day to try to relieve his pain.

III.  <u>The Medical Records</u>

    The medical records in this case are found beginning on page 281 of the administrative record. The pertinent records can be summarized as follows.

    Claimant broke a bone in his lower arm in 2007. He had surgery and wore a cast or a splint for some time afterwards. The cause of the injury, which was to his left arm, was, according to some records, a fall, but others show it stemmed from an altercation with the police. Records from the same emergency room where his fracture was treated show complaints of chest pain from chest tubes placed by another hospital, and also some suggestion of prescription medication abuse, although claimant apparently blamed his wife for using his name to obtain prescriptions. They also indicate some complaints of neck pain radiating into his right arm, headaches, and low back pain. These complaints all appear to have arisen from a fall from a horse which claimant was training a year before, which would have been in 2003. Later records indicate that the wrist was fused in 2008.

    Claimant was evaluated by Dr. Taylor, a clinical psychologist, in 2007 based on a referral from the Ohio Department of Job and Family Services. Claimant (or his wife) reported a prior history of bipolar disorder, anxiety and depression as well as various physical problems. Claimant said he last worked in the late 1990s and had not looked for work since. He reported a history of alcohol abuse. Dr. Taylor thought claimant looked sad, withdrawn and tearful, and older

than his stated age.  She diagnosed him with severe bipolar disorder and a prior history of alcohol abuse, and rated his GAF at 50.  She thought he was unemployable due to psychological issues and rated him as markedly limited in several areas of functioning, including maintaining attention for extended periods, completing a workday or work week without interruption from psychologically-based symptoms, and responding to changes in the work setting.  (Tr. 321-29).

     Claimant sought treatment from an emergency room in March, 2008 after suffering what he described as a nervous breakdown.  At that time, he reported current alcohol use and past cocaine use.  He was diagnosed with a major depressive disorder of moderate severity and his GAF was rated at 41.  He was admitted to the hospital and discharged four days later, by which time his GAF rating had improved to 60.  Earlier emergency room records show that he was treated in June, 2007 for an overdose of pills and alcohol.  His diagnoses at that time were substance-induced mood disorder, polysubstance abuse, and personality disorder, and his GAF was rated at 51.

     Claimant was evaluated by Dr. Tanley, a clinical psychologist and neuropsychologist, on August 25, 2008.  At that time, he was separated from his wife and living with his parents.  He described his daily activities as consisting of watching television.  Mental status testing suggested that claimant's functioning was in the mentally retarded range, but such a diagnosis required other corroboration.  Claimant seemed able to relate to others and to understand simple instructions.  He was moderately impaired in his ability to concentrate and in persistence and pace, and the same was true with respect to his ability to withstand the stress and pressure of work activity.  Dr. Tanley diagnosed a depressive disorder and rated claimant's GAF at 60.  (Tr. 542-44).

Dr. Shapiro, a state agency reviewer, completed a mental residual functional capacity evaluation form on October 16, 2008. He thought that claimant had a number of moderate limitations resulting from his psychological impairments, including in the areas of maintaining attention and concentration for extended periods, staying on schedule, and working closely with others. Dr. Shapiro also saw limits on dealing with work stress, responding appropriately to supervision, and working without interruption from psychologically-based symptoms.  Dr. Shapiro commented that he gave the most weight to Dr. Tanley's assessment and that claimant could do some simple and even some complex tasks as long as his contact with others was superficial and the job did not have strict time or production demands.  (Tr. 580-82).

Dr. Thomas, also a state agency reviewer, expressed an opinion as to claimant's physical residual functional capacity. Dr. Thomas thought claimant could do essentially light work with some limits on his ability to reach and handle, and with no climbing of ropes, ladders or scaffolds or exposure to hazardous machinery or unprotected heights.  (Tr. 598-605).

On October 29, 2009, claimant was seen by North Central Mental Health Services by way of a referral from Netcare. He described a history of mood swings, hallucinations, and paranoia. At that time, the principal diagnoses (stated by a counselor and not a psychologist or psychiatrist) were schizoaffective disorder, bipolar type, PTSD, panic disorder, and claustrophobia. His GAF was rated at 45.  When he was seen again on December 21, 2009, by Dr. Agabalyan, he reported anxiety, difficulty sleeping, paranoia, hearing voices, and depression.  He appeared anxious and jittery.  Dr. Agabalyan's impression was depressive and anxiety disorders, and claimant's GAF was rated at 51.  His medications were changed and he was to be seen again in a month.

(Tr. 804-13).

The remaining records show that claimant had another left wrist surgery in 2009, had surgery on a broken left foot, and was treated for low back pain and neck pain.  He reported to his back doctor that he was working and was getting relief from medications, which allowed him to perform normal home activities.  Another note indicated, however, that he had not worked in four years.

### IV.  The Vocational Testimony

A vocational expert, Dr. Robinson, also testified at the administrative hearing.  Her testimony begins at page 38 of the record.

Dr. Robinson was asked to assume that claimant could perform a limited range of light work, with restrictions on his ability to reach and handle with his left arm and an inability to climb ropes, ladders or scaffolds or work around unprotected heights.  She was also asked to assume that he could understand, remember and carry out simple and some complex tasks and instructions, could maintain concentration and attention for two-hour segments in an eight-hour day, could respond appropriately to supervisors and co-workers and have casual and infrequent contact with others in the workplace, could adapt to simple changes and avoid hazards, and would need to avoid work which had strict production demands.  With those restrictions, that person could, in Dr. Robinson's view, perform certain unskilled jobs such as garment sorter, inspector or marker.  However, someone who would need to take up to 25 unscheduled breaks during the workday could not do those or any other jobs.

### V.  The Administrative Law Judge's Decision

The Administrative Law Judge's decision appears at pages 76 through 94 of the administrative record.  The important findings in that decision are as follows.

-6-

The Administrative Law Judge found, first, that claimant had not engaged in substantial gainful activity from his application date of April 9, 2008 through the date of the decision.  As far as claimant's impairments are concerned, the ALJ found that claimant had severe impairments including degenerative disc disease of the cervical spine, status post right ACL reconstruction procedure and left partial medial meniscectomy procedures, status post fractures of the second, third and fourth metatarsals of the left foot, status post left wrist fusion procedure, and a depressive disorder not otherwise specified.  The ALJ also found that these impairments did not, at any time, meet or equal the requirements of any section of the Listing of Impairments (20 C.F.R. Part 404, Subpart P, Appendix 1).

Moving to the next step of the sequential evaluation process, the ALJ found that claimant had the residual functional capacity to perform a range of light work with restrictions on his ability to reach and handle with his left arm and an inability to climb ropes, ladders or scaffolds or work around unprotected heights, and that he could understand, remember and carry out simple tasks and instructions, could maintain concentration and attention for two-hour segments in an eight-hour day, could respond appropriately to supervisors and co-workers in a task-oriented setting where contact with others is casual and infrequent, and could adapt to simple changes and avoid hazards in a setting without strict production standards.  The ALJ found that, with these restrictions, claimant could perform those jobs identified by the vocational expert, such as garment sorter, inspector and marker, and that significant numbers of such jobs existed in the statewide and national economies.  Consequently, the ALJ concluded that claimant was not entitled to benefits.

    VI. <u>Plaintiff's Statement of Specific Errors</u>

In her statement of specific errors, plaintiff raises three issues. She argues that the ALJ improperly evaluated both the claimant's mental and physical residual functional capacities and that he did not judge claimant's credibility correctly. The Court generally reviews the administrative decision of a Social Security ALJ under this legal standard:

<u>Standard of Review.</u>  Under the provisions of 42 U.S.C. Section 405(g), "[t]he findings of the Secretary [now the Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive. . . ." Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion'" <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971) (quoting <u>Consolidated Edison Company v. NLRB</u>, 305 U.S. 197, 229 (1938)).  It is "'more than a mere scintilla.'" <u>Id</u>.  <u>LeMaster v. Weinberger</u>, 533 F.2d 337, 339 (6th Cir. 1976).  The Commissioner's findings of fact must be based upon the record as a whole. <u>Harris v. Heckler</u>, 756 F.2d 431, 435 (6th Cir. 1985); <u>Houston v. Secretary</u>, 736 F.2d 365, 366 (6th Cir. 1984); <u>Fraley v. Secretary</u>, 733 F.2d 437, 439-440 (6th Cir. 1984).  In determining whether the Commissioner's decision is supported by substantial evidence, the Court must "'take into account whatever in the record fairly detracts from its weight.'" <u>Beavers v. Secretary of Health, Education and Welfare</u>, 577 F.2d 383, 387 (6th Cir. 1978) (quoting <u>Universal Camera Corp. v. NLRB</u>, 340 U.S. 474, 488 (1951)); <u>Wages v. Secretary of Health and Human Services</u>, 755 F.2d 495, 497 (6th Cir. 1985).  Even if this Court would reach contrary conclusions of fact, the Commissioner's decision must be affirmed so long as that determination is supported by substantial evidence. <u>Kinsella v. Schweiker</u>, 708 F.2d 1058, 1059 (6th Cir. 1983).

There are no treating source opinions in this case.  As is apparent from the Court's summary of the medical evidence, there

are also no opinions from any source which support any finding of physical limitations beyond the ones which the ALJ found, and there is only one opinion - that of Dr. Taylor - which would support a finding of a disabling psychological impairment. Consequently, plaintiff's argument is not that the ALJ improperly weighed the opinion evidence; it is that the ALJ improperly weighed the underlying medical evidence.  In particular, plaintiff faults the ALJ for:

    1.  Not correctly factoring into his analysis the evidence concerning claimant's left foot fracture;

    2.  Committing the same type of error with respect to his left wrist condition, which required surgeries through early 2010;

    3.  Disregarding the combination of the IQ scores obtained by Dr. Tanley and claimant's school records (and therefore failing to find that claimant met the requirements of Listing 12.05(C));

    4.  Failing to find that claimant was illiterate as opposed to having a limited education; and

    5.  Failing to apply the Medical-Vocational Guidelines properly, because had the ALJ found that claimant was limited by his foot fracture to sedentary work and that he was illiterate, the Guidelines would have directed a finding of "disabled." According to plaintiff, all of these errors were compounded by the ALJ's erroneous view of the claimant's credibility, which, plaintiff argues, was based upon records which were either clearly incorrect or which contained misstatements made by the claimant due to his poor recall and low IQ.  The Court will discuss each of these issues in turn.

                      A.  <u>The Left Foot Fracture</u>

    Claimant broke his left foot in 2009.  There is no question that this impairment did not exist when Dr. Thomas, the state agency reviewer, expressed the opinion that claimant could do a

limited range of light work, with six hours of daily standing or walking. The question is whether the ALJ reasonably decided that the subsequent foot fracture had no effect on claimant's physical functional capacity.

As the Commissioner correctly notes, the surgery to repair the fracture appears to have been successful, and there is no evidence that claimant needed any assistive devices even for the time period right after the fracture and surgery. It is clear that whatever impact the fracture had on claimant's ability to stand or walk was temporary in nature; in his testimony, claimant did not identify any permanent impact from the fracture, and the administrative hearing took place only a little over a year after claimant broke his foot.

To prove disability, a claimant must show that he is unable to engage in substantial gainful activity by an impairment (or combination of impairments) which has lasted or is expected to last for a continuous period of not less than twelve months. See 42 U.S.C. §423(d)(1)(A). There is no evidence in this record that the foot fracture had any impact on claimant's residual functional capacity for a period as long as twelve months. Consequently, even if it reduced the claimant's functional capacity to sedentary work for a period of time, that time period was too short to have supported an award of benefits. Other courts have similarly discounted claims based on only the temporary inability to work. See, e.g., Zamora v. Astrue, 853 F.Supp. 2d 1048 (D. Or. 2011); see also Bartyzel v. Comm'r, 74 Fed. Appx. 515, 524 (6th Cir. August 26, 2003)("it is reasonable to find that 'temporary' disability will not satisfy the twelve-month statutory durational requirement"). Therefore, it was not unreasonable for the ALJ to find that claimant's residual functional capacity, as assessed by Dr. Thomas, was unaffected by the foot fracture which claimant suffered in 2009.

B.  The Left Wrist Condition

Much the same analysis applies to the way in which the ALJ evaluated claimant's problems with his left wrist. The medical records show ongoing treatment based upon an initial misunion of the bones, followed by several surgeries to fuse the wrist and implant hardware. Because the medical records which Dr. Taylor reviewed show that the issue was ongoing, she restricted claimant with respect to the use of his left hand, as did the ALJ. The subsequent records do not show any greater functional limitations. The Court finds no error in the way in which this impairment was analyzed by the ALJ.

## C. Listing 12.05(C)

Section 12.05(C) of the Listing of Impairments requires a finding of disability when a claimant suffers from mental retardation, as evidenced by an IQ score of 60-70, and also has one or more other severe impairments. There is no question that the IQ test administered by Dr. Tanley produced a qualifying score. Rather, the issue is whether the ALJ reasonably found that the remaining requirements of the Listing had not been met. One of those requirements is that deficits in adaptive functioning manifest themselves prior to age 22.

Here, plaintiff faults the ALJ for ignoring the IQ scores reported by Dr. Tanley. However, the ALJ's decision specifically refers to those scores and notes that they are "consistent with mental retardation." (Tr. 79). In discussing the Listing, the ALJ determined that claimant did not show the required level of deficits in adaptive functioning, noting that he was not in special education classes, did not repeat any grades in school, and that he could read and write. The ALJ also cited to school records showing that claimant was reading at a fourth grade level at the age of 11. Although the records cited by the ALJ are somewhat hard to read, plaintiff has not argued that this factual statement is incorrect.

Again, as the Commissioner correctly notes, it is the

-11-

claimant's burden to demonstrate that all of the requirements of a particular Listing have been met. See, e.g., Daniels v. Comm'r, 70 Fed. Appx. 868, 873 (6th Cir. July 30, 2003)(upholding a denial of benefits where "Plaintiff has not provided any evidence, as required, that her mental deficiency initially manifested before age 22"). The only evidence plaintiff cites is the report card from the claimant's final year of schooling, during which he did not perform well academically. Beyond that, there is little, if any, evidence which would support the existence of deficits in adaptive functioning prior to age 22, and the record also contains evidence from psychologists indicating that the claimant could, despite his low IQ scores, perform both simple and even some complex tasks; Dr. Tanley, who administered the tests, concluded that the claimant was "capable of comprehending and completing simple, routine ADL [activities of daily living] tasks both at home and in the community." (Tr. 544). Given the state of the record, it was reasonable for the ALJ to conclude that claimant did not prove that he met the requirements of Section 12.05(C).

### D. Limited Education or Illiteracy

Plaintiff argues, again based on the results of testing administered by Dr. Tanley, that claimant was illiterate, as opposed to functioning at a seventh to eleventh grade level, which reflects the extent of his formal schooling. However, this argument is coupled with the contention that the claimant could work only at the sedentary level. Under the Medical-Vocational Guidelines, Rule 202.16, a younger individual who is illiterate and who can do only unskilled jobs is deemed not disabled. The Court has found no error in the ALJ's determination that claimant could do a limited range of light work. Therefore, any error as to the ALJ's assessment of claimant's level of education is harmless.

### E. Credibility

Plaintiff's final contention is that the ALJ did not properly assess the claimant's credibility.  She makes much of the fact that he may not have reported his work history properly due to mental limitations and, in any event, any work he might have done was in the nature of a failed work attempt, so that the differing versions of whether he was or was not working should not have led the ALJ to doubt the credibility of his testimony about disabling symptoms.

An ALJ is not permitted to reject allegations of disabling symptoms, including pain, solely because objective medical evidence is lacking.  Rather, the ALJ must consider other evidence, including the claimant's daily activities, the duration, frequency, and intensity of the symptoms, precipitating and aggravating factors, medication (including side effects), treatment or therapy, and any other pertinent factors.  20 C.F.R. §404.1529(c)(3).  Although the ALJ is given wide latitude to make determinations about a claimant's credibility, the ALJ is still required to provide an explanation of the reasons why a claimant is not considered to be entirely credible, and the Court may overturn the ALJ's credibility determination if the reasons given do not have substantial support in the record. See, e.g. Felisky v. Bowen, 35 F.3d 1027 (6th Cir. 1994).

Here, the ALJ found the claimant not to be particularly credible.  That finding was both explained adequately in the record and supported by the record.  The inconsistencies in how claimant explained his work situation, which are replete in the record, might not be direct evidence that he was able to work, but they are proper matters for an ALJ to consider when deciding how much weight to give to the claimant's testimony.  Other inconsistencies, particularly concerning the claimant's use of tobacco, alcohol, narcotic pain medications, and street drugs, were noted by the ALJ and also find support in the record.  Claimant was also noted to be a poor historian by many of the

doctors who treated him.  Given these reasons for discounting his testimony, and given the substantial support elsewhere in the record for the ALJ's assessment of the claimant's physical and mental capabilities, the Court concludes that the ALJ reasonably determined not to give full credit to the claimant's testimony about disabling symptoms.  Thus, the Court finds no error with respect to any of the issues which plaintiff has raised.

## VII.  Recommended Decision

Based on the above discussion, it is recommended that the plaintiff's statement of errors (Doc. 15) be overruled and that judgment be entered in favor of the Defendant Commissioner of Social Security.

## VIII.  Procedure on Objections

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A judge of this Court shall make a de novo determination of those portions  of the report or specified proposed findings or recommendations to which objection is made.  Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions.  28 U.S.C. §636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation de novo, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation.  See Thomas v. Arn, 474 U.S. 140 (1985); United States v. Walters, 638 F.2d 947 (6th Cir. 1981).

                                      /s/ Terence P. Kemp
                                      United States Magistrate Judge